IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HANI AL-SAIMARI,<br><br>Defendant. | MEMORANDUM DECISION<br><br>AND ORDER<br><br><br><br>Case No. 2:12-cr-772 |

Defendant Hani Al-Saimari moves the court to suppress any statements he made to law enforcement agents on November 1, 2012, when he was interviewed during the execution of a search warrant on Victor's Smoke Shop. (Dkt. No. 25.) For the reasons stated below, the court GRANTS his request.

BACKGROUND

On November 1, 2012, the Davis Metro Narcotics Strike Force and other law enforcement agents executed search warrants on a number of stores and other locations in Kaysville, Utah, where the police officers were investigating the sale of "spice." (Tr. of Hr'g on Mot. to Suppress, May 1, 2013, at 7:16-8:10, 13:13-5.) One of the stores for which the officers obtained a search warrant as part of this coordinated effort was Victor's Smoke Shop. (*Id.*) Earlier in the day, Agent Austin Anderson, who was a member of the Strike Force, had been to Victor's and had noticed that Mr. Al-Saimari was the clerk who was currently working in the store. (*Id.* at 17:7-12.) When Agent Anderson and a number of other agents returned later with

the search warrant, Mr. Al-Saimari was still at work.  The police officers searched Mr. Al-Saimari for weapons and handcuffed him.  (*Id.* at 12:7, 15:10-11.)  Agent Anderson then began to question Mr. Al-Saimari.

Agent Anderson recorded the interview, and the initial exchange between Agent Anderson and Mr. Al-Saimari occurred as follows:

> AGENT ANDERSON: Okay, Hani.  I've got some questions for you, okay, but I've got to—I've got to advise you of your *Miranda* rights.  Okay?  Are you familiar with what those are?
>
> MR. AL-SAIMARI: No (inaudible).
>
> AGENT ANDERSON: Not really?  What—what they are is you have rights here—
>
> MR. AL-SAIMARI: Uh-huh.
>
> AGENT ANDERSON: —in America.  We have to read these to you.  These are your rights as a—as a person here, okay, before we can talk to you and interact with you.  Okay?
>
> MR. AL-SAIMARI: Okay.
>
> AGENT ANDERSON: So I'm going to read these to you right off the card so, you know, that I don't forget anything.  It just says "Miranda Warning" up top.  I'm going to read them word-for-word down here.  Okay?
>
> MR. AL-SAIMARI: Okay.
>
> AGENT ANDERSON: Now, Hani, you have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you're being questioned.  If you can't afford to hire an attorney, one will appointed to represent you before any questioning, if you wish.  You—you can decide at any time to exercise these rights and not answer any questions or make any statements.  Do you understand these rights I've explained to you?
>
> (No audible response)

>AGENT ANDERSON: Having these rights in mind, do you wish to talk to me today about what's going on?
>
>MR. AL-SAIMARI: I don't know, you know. I'm just surprised, you know.
>
>AGENT ANDERSON: You're just surprised?
>
>MR. AL-SAIMARI: Yeah.
>
>AGENT ANDERSON: Okay. I—I do need kind of a definite answer of a yes or a no, whether I can ask you questions and interact with you, because you do have these rights. So—
>
>MR. AL-SAIMARI: Okay.
>
>AGENT ANDERSON: —is it okay if I talk to you today?
>
>MR. AL-SAIMARI: Okay.
>
>AGENT ANDERSON: You're okay with that?
>
>MR. AL-SAIMARI: Yeah.
>
>AGENT ANDERSON: Okay.
>
>MR. AL-SAIMARI: Sure.

(Tr. of Interview with Hani Al-Saimari, Nov. 1, 2012, at 2:3-4:3.)

After this exchange, Agent Anderson asked Mr. Al-Saimari a number of questions about the smoke shop. Mr. Al-Saimari now seeks to suppress the statements he made during this interview on the basis that he did not make a knowing and voluntary waiver of his *Miranda* rights.

The court held an evidentiary hearing on this issue on May 1, 2013. The court first heard testimony from Agent Anderson, who stated he has previously come into contact with suspects who do not speak English as a first language and that he believes he is able to tell whether these

people understand him. (Hr'g Tr. at 10:17-11:9.) In this case, Agent Anderson recognized that Mr. Al-Saimari spoke with a strong accent and that he was likely from the Middle East.[1] (*Id.* at 20:22-25, 23:23-24:6.) Nevertheless, Agent Anderson thought that Mr. Al-Saimari could understand him because he did not observe any blank stares or other indications of confusion. (*Id.* at 11:10-14.)

The court also heard testimony from Professor William Gregory Eggington, who has an extensive background in linguistics. (*Id.* at 40:3-41:3.) Professor Eggington's doctoral dissertation concentrated on the challenges faced by non-native English speakers when dealing with government services in the United States. (*Id.* at 41:24-42:10, 42:22-43:3.) Professor Eggington reviewed the recording and written transcript of the exchange between Mr. Al-Saimari and Agent Anderson. (*Id.* at 46:1-7.) He also conducted interviews with Mr. Al-Saimari and evaluated his language proficiency using two peer-reviewed linguistics tests, the Oral Proficiency Interview and the Elicited Oral Response with Automatic Speech Recognition exam. (*Id.* at 46:7-49:5.) Based on the results of these tests, Professor Eggington concluded that Mr. Al-Saimari has "survival language proficiency," meaning that Mr. Al-Saimari can only understand simple sentences in English involving basic necessities, and not complex ideas or concepts. (*Id.* at 51:10-11, 57:4-58:1.) Professor Eggington learned through his interactions with Mr. Al-Saimari that Mr. Al-Saimari is not literate in English and that the majority of his interpersonal interaction is within a small immigrant community that speaks in Arabic. (*Id.* at 59:6-9.)

Professor Eggington further testified that many second language learners who have low

---

[1] Mr. Al-Saimari was raised in Iraq and lived in a refugee camp in Saudi Arabia before coming to the United States in 1997. (Tr. of Interview, 32:20-33:22.)

proficiency will "fake comprehension" in conversations, even when they do not understand what they are hearing. (*Id.* at 58:2-10.) One indicator of fake comprehension in a speaker with low proficiency is the use of responses such as "yes, uh-huh, okay." (*Id.* at 58:13.) Professor Eggington noted that the majority of Mr. Al-Saimari's responses to Agent Anderson while they were discussing Mr. Al-Saimari's *Miranda* rights were one-word replies in which Mr. Al-Saimari said either "Yeah" or "Okay."

Finally, Professor Eggington testified that the *Miranda* warnings are linguistically complicated and that the warnings make use of phrases such as "will be used against you" that are infrequently heard in normal conversation. (*Id.* at 66:21-68:9.) Given this complexity, the rapid speed with which Agent Anderson read Mr. Al-Saimari his *Miranda* rights, and Professor Eggington's analysis of Mr. Al-Saimari's linguistic capabilities in English, Professor Eggington concluded that Mr. Al-Saimari did not comprehend the *Miranda* warnings that Agent Anderson read to him. (*Id.* at 76:9-11, 78:20-80:14.)

## ANALYSIS

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that custodial interrogations have the potential to undermine the Fifth Amendment right against self-incrimination and that the prosecution must demonstrate the use of procedural safeguards to secure this privilege. 384 U.S. 436, 444 (1966). Specifically, the person about to be questioned must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney. *Id.* Statements made to the police during a

5

custodial interrogation are inadmissible if the defendant does not waive these *Miranda* rights knowingly and voluntarily. *See Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010).

Whether a defendant validly waived his *Miranda* rights is a mixed question of law and fact. *Davis v. Workman*, 695 F.3d 1060, 1068 (10th Cir. 2012). As the Supreme Court explained, the inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). Importantly, it is the prosecution's burden to show that a defendant's statements are admissible: "The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver, and the voluntariness of the confession." *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (citations omitted).

Here, the parties do not dispute that Agent Anderson's interview with Mr. Al-Saimari was a custodial interrogation. Mr. Al-Saimari was handcuffed after police officers entered Victor's Smoke Shop with a valid search warrant, and a reasonable person in Mr. Al-Saimari's position would not have felt free to leave under these circumstances. *See Yarborough v. Alvarado*, 541 U.S. 652, 663-65 (2004) (holding that a suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the encounter and leave). Similarly, the parties agree that Mr. Al-Saimari was not intimidated or coerced during the questioning. Agent Anderson did not raise his voice or threaten Mr. Al-Saimari in any way.

6

While Mr. Al-Saimari at one point expressed some discomfort from the handcuffs, this minor level of pain is insufficient to demonstrate that Mr. Al-Saimari's waiver of his rights was not voluntary. *See United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988) (holding that a defendant gave a voluntary waiver even though he had been held in an uncomfortably hot cabin on a Navy vessel for several days, he was suffering from sea sickness, and he was in severe pain after his wrists were broken during his arrest).

Instead, the defense focuses its argument on whether Mr. Al-Saimari had the requisite level of comprehension to make a knowing waiver of his rights. Mr. Al-Saimari contends that because he did not understand the *Miranda* warnings that Agent Anderson gave him, his waiver of these rights was invalid.

The best evidence of whether Mr. Al-Saimari had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," *Moran*, 475 U.S. at 421, is the recording and transcript of Mr. Al-Saimari's alleged waiver. If it is clear from the recording that Mr. Al-Saimari knowingly and voluntarily gave up his rights and consented to speak with Agent Anderson, then there is no need to examine additional evidence. If what Mr. Al-Saimari understood from his interaction with Agent Anderson is ambiguous, then the court will turn to the extrinsic evidence that both parties have submitted.

After carefully listening to the recording, the court finds that it is unclear whether Mr. Al-Saimari understood that he was giving up his right to remain silent and his right to speak to an attorney when he consented to answer Agent Anderson's questions. The exchange concerning Mr. Al-Saimari's *Miranda* rights begins when Agent Anderson asks Mr. Al-Saimari if he is familiar with these rights. Mr. Al-Saimari replies, "No." Agent Anderson then explains the

7

rights in a manner that suggests that they are something that Agent Anderson must read aloud before he begins asking Mr. Al-Saimari questions: "We have to read these to you. These are your rights as a—as a person here, okay, before we can talk to you and interact with you. Okay?" It is unclear from this statement that the *Miranda* rights are something that Mr. Al-Saimari can choose to exercise, not simply something that Agent Anderson must read aloud.

After Agent Anderson reads the *Miranda* warnings, he asks if Mr. Al-Saimari understands his rights. Mr. Al-Saimari does not respond. Instead of repeating the question, Agent Anderson then asks, "Having these rights in mind, do you wish to talk to me today about what's going on?" Mr. Al-Saimari replies, "I don't know, you know. I'm just surprised, you know." In the exchange that follows, Mr. Al-Saimari eventually says "okay," "yeah," and "sure," but it appears that Mr. Al-Saimari is merely answering yes to Agent Anderson's follow-up question, "[I]s it okay if I talk to you today?" Mr. Al-Saimari never states that he understands his *Miranda* rights or that he agrees to waive those rights, and the exchange is ambiguous as to whether Mr. Al-Saimari comprehended that he could remain silent or ask for an attorney. The court also notes that Agent Anderson read the *Miranda* warnings quite rapidly, making it difficult for a non-native English speaker to understand the meaning of these rights.

Because the court's analysis of the exchange itself does not answer the question of whether Mr. Al-Saimari made a knowing waiver of his *Miranda* rights, the court will consider the additional evidence presented by the parties. The United States argues that the audio recording of the exchange between Agent Anderson and Mr. Al-Sairmari in its entirety, including the remainder of the discussion that occurred after Agent Anderson read Mr. Al-Saimari his *Miranda* rights, demonstrates that Mr. Al-Saimari had a sufficient command of English to make

8

a knowing waiver. The government also points to Mr. Al-Saimari's residence in the United States since 1997 and his work experience at Victor's Smoke Shop as evidence that Mr. Al-Saimari had an adequate command of the English language. Finally, the United States relies on the testimony of Agent Anderson, who stated during the evidentiary hearing that he had experience communicating with non-native English speakers and that, based on this experience and the lack of any blank stares or other signs of confusion from Mr. Al-Saimari, he believed that Mr. Al-Saimari could understand him.

The evidence provided by the United States is entitled to some weight, but the court finds that this evidence is insufficient to satisfy the government's burden of proving a knowing and voluntary waiver of important constitutional rights. Considering the entirety of the interaction between Agent Anderson and Mr. Al-Saimari, it is clear that Mr. Al-Saimari is able to maintain a simple conversation and understands many of Agent Anderson's questions. But Mr. Al-Saimari's answers are generally short and he is sometimes non-responsive. And even though Mr. Al-Saimari has lived in the United States for some time, the government did not present any evidence of how frequently Mr. Al-Saimari interacts with other people in English. While the United States cited a number of cases in which the courts have considered the length of a defendant's residency as evidence of the defendant's ability to knowingly waive his rights, these courts have also considered other relevant indicators of a defendant's linguistic abilities, such as a defendant's education and work history. *See, e.g.*, *United States v. Sriyuth*, 98 F.3d 739, 750 (3d Cir. 1996) (finding a waiver valid where a Thai immigrant had lived in the United States for nine years, but also noting that the defendant had attended high school in the United States, had managed a fast food restaurant and worked in construction, and had testified that he knew he was

entitled to a lawyer upon arrest from watching movies and television shows).

Moreover, the United States did not present any additional evidence to rebut the testimony of Professor Eggington.  As discussed above, Professor Eggington evaluated Mr. Al-Saimari using two different linguistic tests and testified that these tests are an accepted means of measuring a non-native speaker's language proficiency.  Professor Eggington also interviewed Mr. Al-Saimari and reviewed the recording of Mr. Al-Saimari's interaction with Agent Anderson.  Based on this information, Professor Eggington testified that Mr. Al-Saimari had low proficiency in English and could only understand basic concepts.  While Mr. Al-Saimari may sometimes be able to fake comprehension of more complex ideas during conversation, Professor Eggington concluded that Mr. Al-Saimari did not understand the *Miranda* warnings that Agent Anderson read to him.

The court finds that the evidence presented by both parties is in equipoise. Notwithstanding the testimony of Professor Eggington, Mr. Al-Saimari may have had an understanding of *Miranda* rights from his exposure to movies and television during his lengthy residency in the United States.  But the nature of his interaction with Agent Anderson is inconclusive as to his comprehension of the *Miranda* warnings.  Mr. Al-Saimari never affirmatively stated that he understood his rights, but merely assented to Agent Anderson's request to speak with him.  A non-native speaker's understanding of *Miranda* need not be ideal, and the Tenth Circuit has held that the translation of a suspect's *Miranda* rights into the suspect's native language "need not be a perfect one, so long as the defendant understands that he does not need to speak to police and that any statement he makes may be used against him."  *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990).  But given the totality of the circumstances

here, the court cannot say that it was more likely than not that Mr. Al-Saimari understood that he had the right to remain silent and that any statements he made could be used against him. As a result, the United States has not carried its burden to demonstrate a knowing and voluntary waiver by a preponderance of the evidence and Mr. Al-Saimari's later statements to Agent Anderson must be suppressed.

The court notes that Mr. Al-Saimari brings his motion under the Fifth Amendment, not the Fourth Amendment. Under the Fourth Amendment, the court may suppress evidence as a means to deter unconstitutional behavior on the part of an arresting officer. Here, there is no evidence that Agent Anderson exceeded his authority and the court has no reason to doubt that Agent Anderson believed in good faith that he had obtained a knowing and voluntary waiver of Mr. Al-Saimari's rights. The court simply holds that, given the totality of the circumstances on the facts here presented, the United States has failed to demonstrate by a preponderance of the evidence that Agent Anderson's belief was correct. Accordingly, the court cannot find under the Fifth Amendment that Mr. Al-Saimari made a knowing and voluntary waiver of his *Miranda* rights.

While the court's holding is required by the Constitution, the court has carefully considered whether its ruling places an undue burden on police officers who are attempting to perform their jobs while respecting a suspect's constitutional rights. Officers often encounter dynamic situations when obtaining information about criminal activity and may feel rushed or pressured when they are determining whether a suspect has validly waived his rights. But the *Miranda* warnings are only required when a suspect is in custody, at which point law enforcement has generally established some control over the situation and can take more time to

ensure that a suspect's important Fifth Amendment rights have been protected. Moreover, the court does not believe that its decision requires that police officers become linguistic experts. Instead, the Fifth Amendment merely demands that an officer ask follow-up questions as necessary to establish a knowing and voluntary waiver when, as was the case with Mr. Al-Saimari, a suspect expresses or manifests confusion, or fails to state affirmatively that he understands the *Miranda* warnings. An officer cannot simply obtain a suspect's consent to speak, but must adequately determine that a suspect understands that he has the right not to speak. Without this assurance, the reading of a suspect's *Miranda* warnings is a mere formality that does not adequately protect the person's constitutional right against self incrimination.

## CONCLUSION

For the reasons stated above, the Defendant's Motion to Suppress (Dkt. No. 25) is GRANTED. Any statements that Mr. Al-Saimari made to Agent Anderson or other law enforcement officers while he was in custody are SUPPRESSED.

SO ORDERED this 8th day of October, 2013.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge